## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ARTURO GONZALEZ-RENTERIA,

   Defendant.

CRIMINAL ACTION FILE NO.

1:17-cr-0292-ELR-AJB

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

Before the Court are the motions filed by Defendant Arturo Gonzalez-Rentaria ("Defendant" or "Gonzalez") to suppress evidence of Global Positioning System ("GPS") tracking, [Doc. 121], and Title III and roving wiretaps, [Doc. 122]. The Court held a limited evidentiary hearing, [Doc. 335 ( hereinafter "T__")], and the parties filed post-hearing briefs. [Docs. 327, 330, 332]. For the following reasons, the undersigned **RECOMMENDS** that the motions be **DENIED**.

## I.     Global Positioning System ("GPS") tracking, [Doc. 121 (Ping Warrant for 770-548-6041)

### A.     Facts

On March 31, 2017, DEA Special Agent Kimbrell C. Dodder, Jr., applied for and obtained a search warrant for geo-location data for AT&T cellular

telephone number 770-548-6041 ("the 6041 phone"), used by an unnamed individual. *In the Matter of the Search of the AT&T Cellular Telephone Number 770-548-6041*, Case No. 1:17-MC-309 (N.D. Ga. issued Mar. 31, 2017) (under seal) (hereinafter "Ping Warrant").[1]   In his affidavit, Dodder averred that in September 2016 DEA Atlanta initiated a drug and money-laundering wiretap investigation of an organization in Atlanta, Mexico, and elsewhere.   Ping Warrant, ¶ 15.   He advised that the DEA was intercepting electronic communications over several telephones: (1) Target Telephone ("TT") # 2, used by "Tommy Gun," (2) TT # 5, used by "Positivo,"   (3) TT # 6, used by "Primo Siempre," and (4) TT # 7, used by "Piter."   He recounted that Tommy Gun, Primo Siempre, and Piter were believed to be in Mexico based on the IP addresses and international service providers associated with those phones.   *Id.*   The investigation led agents to believe that "Servicio" coordinated the shipment of drugs from Mexico to the Atlanta area, as well as money pickups in the United States; Siempre was a drug source of supply for whom Servicio provided transportation; and that "Chatagool" was Servicio's customer.   *Id.*

---

[1]      Subsequently, Gonzalez was found to be the user of the 6041 phone. The Government does not contest his "standing" to challenge the searches in this case.

Dodder further related that on March 19, 2017, agents intercepted a
Blackberry PIN-to-PIN conversation between Siempre, using TT # 6, and "Rolex,"
in which Siempre passed along the number of the 6041 phone and provided "on
behalf of Primo" as the password to authenticate the call.  *Id.*, ¶ 16.  On March 29,
2017, at 8:38 PM, agents intercepted a Blackberry PIN-to-PIN conversation
between Siempre and Chatagool, in which Siempre stated the number to the 6041
phone.  *Id.*, ¶ 17.  An hour and a half later, at 10:08 PM, with both using the same
devices as just described, during another Blackberry PIN-to-PIN conversation,
Chatagool was intercepted advising Siempre that "[t]hey already gave that to the
guy, buddy," which Dodder interpreted to mean that the user of the 6041 phone had
been given drug proceeds.  *Id.*, ¶ 18.  Then, at 10:22 PM, agents again intercepted
them over the same devices, reporting that Chatagool advised Siempre " '44,' "
which Dodder interpreted as meaning that $44,000 in drug proceeds had been given
to the user of the 6041 phone, to which Siempre responded, "Okay."  *Id.*, ¶ 19.  The
next day, on March 30, 2017, agents intercepted a Blackberry PIN-to-PIN
conversation in which Rolex asked Siempre  for "a phone number.  So they can
give you some money," to which Siempre responded, "Great, here it goes, 770-
548-6041, on behalf of Primo," which Dodder averred showed Siempre passing the

number of the 6041 phone and the password in order to facilitate the collection of drug proceeds. *Id.*, ¶ 20.

Dodder then summarized the investigation to date as follows:

> During this investigation, agents have intercepted electronic communications between conspirators passing phone numbers for couriers similar to the manner in which PRIMO SIEMPRE passed the SUBJECT TELEPHONE to multiple conspirators in March 2017. Specifically, one conspirator will send another conspirator a phone number and provide a password to authenticate the call (i.e., "On behalf of Primo"). Pursuant to federal court authorization, agents have monitored geo-location data from devices connected to numbers passed over the wire in this manner, which has led to the identification of drug stash locations and couriers, and ultimately the seizure of narcotics in the Atlanta, Georgia area.

*Id.*, ¶ 21.

In granting the warrant application, the issuing magistrate judge "specifically authorized the disclosure of transmissions from the Subject Telephone's geo-location function at ANY TIME IN THE DAY OR NIGHT, as I find that reasonable cause has been established, including the monitoring of transmissions: (1) from inside private residences, garages, and other areas not open to the public or visual surveillance; and (2) from inside or outside the Northern District of Georgia, so long as the Subject Telephone remains in the United States." *In the Matter of the Search of the AT&T Cellular Telephone Number 770-548-6041*, Case No. 1:17-MC-309 (N.D. Ga. issued Mar. 31, 2017) (under seal). The issuance of

4

this geo-location warrant led to other GPS warrants and the issuance of Title III and roving authorized intercepts, and thus the lawfulness of the warrant for the 6041 phone is critical to the lawfulness of the subsequent warrants.

The warrant for the 6041 phone permitted execution of the warrant at any time in the day or night based upon the issuing judge's finding that "reasonable cause" existed to allow law enforcement agents to obtain geo-location data from the 6041 phone at any time of the day or night, and outside of the 6:00 AM to 10:00 PM limitation set forth in Federal Rule of Criminal Procedure 41(e)(2)(A)(ii). Rule 41(e)(2)(A)(ii), however, authorizes anytime execution of a search warrant upon a finding of "good cause" by the issuing judge *Id.* The Court held an evidentiary hearing to allow the Government to demonstrate, if it could, that it had "good cause" to permit anytime pinging of a telephone used by Defendant, or if it could not do so, to demonstrate "good faith" under *United States v. Leon*, 468 U.S. 897 (1984).

The facts at the hearing demonstrated that the co-case agent, Dodder,[2] presented the warrant for the 6041 phone to the Magistrate Judge on March 31,

---

[2] Dodder was a narcotics agent with the Mississippi Bureau of Narcotics ("MBN") for eight years and was a DEA task force officer for one case while he worked for MBN. He graduated from the DEA Academy in October 2015 and became a DEA Special Agent in Atlanta in February 2016. T12, 36, 38.

2017, and the judge approved the warrant and issued it.[3]  T10.  After the warrant was signed, Dodder faxed the warrant to AT&T, who in complying with the warrant, emailed to Dodder geo-location data every 15 minutes, 24 hours a day. T10-11.

Dodder explained that he has obtained approximately 20 geo-location data warrants in federal court, although he could not state whether he had been the affiant on any applications between February 2016 and the instant application.  T12, 22-23.  It was his understanding that other ping warrants contained the same language concerning anytime execution, as well as inside private residences and garages that are not open to the public or visual surveillance.  T14, 23, 29.  The Title III authorization for other phones in the investigation allowed for anytime interception.  T16.  Specifically, a telephone used by Primo Siempre was intercepted as to calls after 10:00 PM and were referenced in the affidavit for the 6041 ping at ¶¶ 18 and 19.  T17.  None of the telephone calls intercepted pursuant to the Title III interceptions where the 6041 phone was discussed involved conversations with the 6041 phone.  T32.

---

[3]      The parties stipulated that after the search warrant was executed, AT&T "pinged" the 6041 phone every 15 minutes, including between the hours of 10:00 PM and 6:00 AM, and therefore, that Defendant had standing to challenge the anytime execution of the warrant.  T7-8.

Dodder also testified that in his experience drug deals can happen at any time of the day or night, T19, and that agents used the data obtained from the ping warrants to surreptitiously determine the location of the person using the phone. T20-21.  He continued that pinging the phone does not cause any disruption in the phone's user's service.  T20.  Dodder conceded that every warrant for a ping authorization has the same anytime language.  T35.

## B.    Discussion

### 1.    Probable cause

The Court rejects Gonzalez's argument that the ping warrant was not supported by probable case.[4]  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Thus, " '[t]he Fourth Amendment demonstrates a strong preference for searches conducted pursuant to a warrant.' "  *United States v. Bell*,

_____

[4]    Since a search warrant was obtained to ping the 6041 phone, Gonzalez's arguments that law enforcement unlawfully trespassed on his protected Fourth Amendment rights, [Doc. 121 at 9-16], is rejected.  The Government concedes that pinging a phone under the circumstances involved in this case constitutes a search for Fourth Amendment purposes.  [Doc. 135 at 5-6].  In the text, the Court analyzes whether the ping warrant properly was issued.

7

588 Fed. Appx. 875, 877 (11th Cir. Oct. 7, 2014) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996) (quotation omitted)).

Search warrants are presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The defendant bears the burden of establishing that the warrant was defective or executed improperly. *Id.*; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B Jan. 27, 1981)[5]; *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).[6]

For a search warrant to be valid, it must be supported by probable cause. *United States v. Leach*, 498 Fed. Appx. 915, 916 (11th Cir. Nov. 21, 2012) (citation omitted). Whether the search warrant affidavit establishes probable cause is a question of law. *United States v. Miller*, 24 F.3d 1357, 1360 (11th Cir. 1994).

Probable cause to support the issuance of a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of

---

[5] The Eleventh Circuit has adopted as binding all decisions issued by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

finding contraband or evidence at a particular location.  *See United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991).  "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).  "[P]robable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  Moreover, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.' " *United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1376 (N.D. Ga. 2001) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996)).  Yet, an affidavit will be found deficient if it contains merely conclusory allegations and fails to provide sufficient information in order for the judge to conclude "that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (internal quotation marks omitted).  That is, conclusory statements in a search-warrant affidavit that do not have sufficient

factual support will not sustain a probable-cause finding.  *Gates*, 462 U.S. at 239

("Sufficient information must be presented to the magistrate to allow that official

to determine probable cause; his action cannot be a mere ratification of the bare

conclusions of others.  In order to ensure that such an abdication of the magistrate's

duty does not occur, courts must continue to conscientiously review the sufficiency

of affidavits on which warrants are issued.").

The task of the issuing magistrate judge in determining whether to issue a

warrant "is simply to make a practical, common-sense decision whether, given all

the circumstances set forth in the affidavit before him, including the 'veracity' and

'basis of knowledge' of persons supplying hearsay information, there is a fair

probability that contraband or evidence of a crime will be found in a particular

place."  *Gates*, 462 U.S. at 232; *United States v. Jiminez*, 224 F.3d 1243, 1248

(11th Cir.  2000); *see also United  States  v.  Somers*,  591 Fed. Appx. 753,  756

(11th Cir. Nov. 14, 2014).

In deciding whether to issue a search warrant, the issuing judge may rely

upon the opinions and conclusions of an experienced law enforcement agent-affiant,

*United  States  v.  Robinson*,  62 F.3d 1325,  1331  n.9  (11th Cir. 1995),  since

"[c]onduct  innocent  in  the  eyes  of  the  untrained  may  carry  entirely  different

'messages'  to  the  experienced  or  trained  observer."  *United States v. Gonzalez*,

969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)); *see also United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.") (citations omitted).

Further, to justify a search, the circumstances must indicate why evidence of the alleged illegal activity likely will be found in a particular place. *Gates*, 462 U.S. at 238; *Warden v. Hayden*, 387 U.S. 294, 307 (1967); *United States v. Griffin*, 555 F.2d 1323, 1325 (5th Cir. 1977). Thus, " 'the affidavit should establish a connection between the defendant and the [place] to be searched and a link between the [place] and any criminal activity.' " *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *Martin*, 297 F.3d at 1314). Moreover, "the nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982); *cf. United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (evidence of possession of contraband of type normally expected to be hidden in residence will support search); *United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (nexus between items to be seized and defendant's home can be established

11

circumstantially where contraband is capable of being hidden in residence); *see also United States v. McKinney*, 758 F.2d 1036, 1043 (5th Cir. 1985) (noting that the nexus between the place to be searched and the items to be seized may be established either by direct evidence or " 'normal inferences as to where the articles sought would be located[,]' " the court stated that, "[i]n determining whether a magistrate has drawn a 'normal inference' that evidence, fruits or instrumentalities of crime might be found at a given location, we have considered both the distance between the criminal activity . . . and the premises to be searched and the nature of the criminal activity") (citation omitted).

Finally, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)); because a search is not to be made legal by what it turns up. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Then, the task of a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant, *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination of probable cause to issue a search warrant." *Robinson*,

12

62 F.3d at 1331 (citing *Gonzalez*, 940 F.2d at 1419).   Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrate judges in their probable cause determinations.  *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also Miller*, 24 F.3d at 1361.  As the Supreme Court has instructed, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109).

Considered with these standards in mind, the Court concludes that the issuance of the ping warrant for the 6041 phone was supported by probable cause. As noted in the affidavit, agents had monitored geo-location data from devices connected to numbers passed over the wire in this manner, which had led to the identification of drug stash locations and couriers, and ultimately the seizure of narcotics in the Atlanta, Georgia area.  The conversations detailed in the affidavit demonstrate that the organization was using the holder of the 6041 phone to collect

13

drug-transaction proceeds.  The issuing magistrate judge could reasonably rely on Dodder's opinion regarding the calls that he linked to drug activity and money laundering involving the subject telephone.  *See United States v. Valencia*, 24 F.3d 1106, 1110 (9th Cir. 1994) ("It is proper to give weight to an agent's opinion as to evidence of drug trafficking."); *United States v. Flores*, No. 1:05-CR-558-WSD-JFK, 2007 WL 2904109, at *24 n. 16 (N.D. Ga. Sept. 27, 2007) ("If a jury can properly consider this evidence, a District Judge may certainly take it into consideration in determining whether probable cause exists to authorize communication intercepts.").  *Cf. Jiminez*, 224 F.3d at 1248-49 (finding that affidavit supported finding of probable cause even though it did not detail particular phone conversations and only stated agents' opinion that they "indicate[d]" that drug activity occurred); *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) (rejecting notion, in good-faith exception analysis, that agents' interpretation of coded conversations was unreasonable); *see also United States v. Gonzalez-Perez*, 283 Fed. Appx. 716, 721 n.6 (11th Cir. June 24, 2008) (finding probable cause based on coded conversations); *Jenkins*, 901 F.2d at 1081 (holding, in a case involving a bank larceny, that a warrant established probable cause to search the residence of the individual who probably committed the theft because the items sought were capable of being hidden in a residence and because, based on the

14

agent's opinion, stolen items are likely to be hidden in the residence of the thief); *United States v. Booker*, Criminal File No. 1:11-CR-255-TWT, 2013 WL 2468694, at *17 (N.D. Ga. June 7, 2013) (" 'Courts considering wiretap applications are allowed to rely upon the reasonable interpretations given by experienced law enforcement affiant-agents as to the code, slang or obtuse language used by those persons engaged in allegedly conspiratorial communications.' ") (citation omitted) (Thrash, J., *adopting* Vineyard, M.J.).

Gonzalez further argues that the warrant application was deficient in that it did not establish a nexus between the suspect and the phone, the phone and the criminal activity, as well as the criminal activity and the suspect's location in protected areas, rather than merely probable cause that the suspect is engaged in criminal activity. [Doc. 330 at 8-9 (citing *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008); *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016); *United States v. Fitzgerald*, 754 Fed. Appx. 351 (6th Cir. Nov. 1, 2018)); and *United States v. Roach*, 582 F.3d 1192 (10th Cir. 2009))]. Of course, none of these cases are binding on this Court. *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1307, n.12 (11th Cir. 2021) (" 'Under the established federal legal system the decisions of one circuit are not binding on other circuits.' ") (quoting *Bonner*, 661 F.2d at 1209).

Furthermore, each of the cases he relies upon deals with a residential search warrant and not a geo-location data warrant for a cell phone.

In any event, the Court is unpersuaded that the required nexus was not shown. As previous noted, a sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Noriega*, 676 F.3d at 1261; *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011). The Fourth Amendment also requires "a nexus between the item to be seized . . . and criminal behavior." *Warden*, 387 U.S. at 307; *United States v. Golden*, 545 Fed. Appx. 920, 922 (11th Cir. Nov. 20, 2013). To establish a nexus in cases where the evidence sought is not contraband or a fruit or instrumentality of a crime, an affidavit or application must demonstrate that "the evidence sought will aid in a particular apprehension or conviction." *Warden*, 387 U.S. at 307. The Eleventh Circuit has "established the following guidelines for determining the validity of a warrant affidavit: (1) demonstration of a connection between the defendant and the location to be searched; (2) demonstration of a link between the location and criminal activity; and (3) demonstration of the informant's veracity and basis of knowledge." *United States v. Joseph*, 709 F.3d 1082, 1099 (11th Cir. 2013); *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir. 2002) (per curiam). Here, these requirements

16

are satisfied because the affidavit demonstrated that through the intercepted PIN-to-PIN conversations the coconspirators used PIN-to-PIN conversations to communicate with each other and the holder of the 6041 phone; a link between narcotics-proceeds pickups and the user of the 6041 phone; and the basis of and the veracity of the affiant's information. *Jiminez*, 224 F.3d at 1248-49 (finding that affidavit supported finding of probable cause even though it did not detail particular phone conversations and only stated agents' opinion that they "indicate[d]" that drug activity occurred).  The Court also observes that cell phones have been recognized to be important tools in facilitating coordination and communication among members of criminal enterprises, *Riley v. California*, 573 U.S. 373, 401 (2014), and can provide valuable incriminating information about drug-trafficking organizations since they are "known tool[s] of the drug trade."  *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990).  Thus, it was more than likely that evidence related to the drug organization's activities would be discovered through pinging the 6041 cell phone. *See United States v. Kendricks*, No. 1:15-CR-400-MHC-AJB, 2016 WL 5952743, at *7 (N.D. Ga. Oct. 13, 2016) (finding warrant affidavit established nexus between cell phone and alleged gang activity, and citing *Riley v. California* for the proposition that "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal

17

enterprises, and can provide valuable incriminating information about dangerous criminals"), *aff'd*, 723 Fed. Appx. 950 (11th Cir. Feb. 8, 2018). Moreover, it is of no moment that the agents were unaware of Gonzalez's identity at the time the warrant was sought since it is the very connection between that anonymity and the criminal activity that provides the nexus needed for the search. *United States v. Matter of Search of Info. Associated with Fifteen Email Addresses Stored at Premises Owned, Maintained, Controlled or Operated by 1&1 Media, Inc.*, No. 2:17-CM-3152-WKW, 2017 WL 8751915, at *2 (M.D. Ala. Dec. 1, 2017) (citing *Warden*, 387 U.S. at 307). Thus, the affidavit established sufficient probable cause to satisfy the Fourth Amendment's strictures as to the targeted telephone because the application demonstrated that geo-location data from the target phone would likely provide evidence of criminal activity.

### 2.    *Leon* good faith

Even if probable cause did not exist, the agents had good-faith reliance on the issuance of the warrant. When law enforcement officers act with "an objectively reasonable good-faith belief that their conduct is lawful"—i.e., by acting in reasonable reliance on a warrant, statute, or court order—the exclusionary rule does not apply because there is little, if any, deterrence benefit in such circumstances. *See Davis v. United States*, 564 U.S. 229, 238-39 (2011); *Leon*,

468 U.S. at 918-22; *United States v. Green*, 981 F.3d 945, 957 (11th Cir. 2020);

*Martin*, 297 F.3d at 1313.  Under this good-faith exception to the exclusionary rule,

suppression is necessary "only if the officers were dishonest or reckless in

preparing their affidavit or could not have harbored an objectively reasonable belief

in the existence of probable cause."  *Id.* (quotation and citation omitted).  There is

no indication that any of these situations occurred in this case.  Good faith existed

because the 6041 ping warrant followed the issuance of Title III orders allowing

the interception of Siempre's and others' phones.   These conversations

demonstrated that Siempre and others were using the holder of the 6041 phone to

collect drug proceeds.  *Cf. United States v. Villanueva*, 821 F.3d 1226, 1236-37

(10th Cir. 2016) (suppression of evidence from residence searched by warrant not

warranted under *Leon* where supporting affidavit set forth wiretap communications

demonstrating defendant's involvement in drug trafficking and using others to

facilitate his activity).

### 3.    Anytime execution

In his opening brief, Gonzalez argued that the issuing judge had to find that

probable cause, and not reasonable cause, existed in order to authorize a search

warrant to be executed at any time.  [Doc. 121 at 29-30].  In his post-evidentiary

hearing brief, he argued that nighttime searches were considered unreasonable by

the Framers, authorization for such a search must be made by a neutral magistrate, and that since a nighttime search implicates the reasonableness prongs of the Fourth Amendment, the Court should require additional exigency or necessity beyond probable cause to justify the nighttime execution of a search warrant.  [Doc. 330 at 2-7].

The Court rejects these arguments.  Suffice it to say that there is nothing in the Fourth Amendment that requires a search warrant only be executed during the daytime.  *See United States v. Gerber*, 994 F.2d 1556, 1559 (11th Cir. 1993) ("While the amendment requires an '[o]ath or affirmation . . . particularly describing the place to be searched, and the persons or things to be seized,' it contains no requirements about *when* the search or seizure is to occur or the duration.  U.S. Const. amend. IV.") (emphasis in original).  Moreover, the position espoused by Gonzalez is contrary to binding precedent in this Circuit that holds that no special showing is needed beyond probable cause to issue the warrant and "reasonable cause" to conduct a nighttime execution, to which precedent this Court owes fealty:

> Appellants contend that the requirement that 'reasonable cause' must be shown to justify a nighttime search under a warrant means that some such subst[an]tial showing be made for the need for acting on such warrant at night.  Appellant would equate this requirement with the requirement for a showing of probable cause for the issuance of the warrant.  *Here, of course, probable cause must be shown for the*

20

> *issuance of the warrant, but beyond that the only requirement is that there be cause for carrying on the unusual nighttime arrest or search that, upon showing made, convinces the magistrate that it is reasonable.* Finding that the evidence before the magistrate here met this requirement, we do not consider it necessary or appropriate to attempt to delineate the precise boundaries that are covered by this language in the Rule.

*United States v. Curry*, 530 F.2d 636, 637-38 (5th Cir. 1976); *see United States v. Moore*, No. 2:05-cr-50-FtM-29SPC, 2006 WL 560640, at *10 (M.D. Fla. Mar. 7, 2006) ("The daytime execution of a search warrant requirement of Rule 41 is not required by the Fourth Amendment, since no special showing is constitutionally required for a nighttime execution of a search warrant.") (citing *Gooding v. United States*, 416 U.S. 430 (1974)), *aff'd*, 257 Fed. Appx. 254 (11th Cir. Dec. 7, 2007); *see also United States v. Berry*, 113 F.3d 121, 123 (8th Cir. 1997) ("We have held that night searches are not per se unconstitutional and thus 'suppression is not automatic' if Rule 41[ ] is violated." (citation omitted)).[7]

Turning then to the "good cause" requirement of Rule 41(e)(2)(A)(ii) versus the "reasonable cause" finding in the search warrant in this case, the Court first

---

[7]     The Supreme Court has held that 21 U.S.C. § 879 requires no special showing for a nighttime search, other than a showing that the contraband is likely to be on the property or person to be searched at that time. *Gooding*, 416 U.S. at 458.

observes that at least one commentator has noted that the different language

constitutes a difference without a distinction:

> By amendment in 1972, Fed.R.Crim.P. 41(c) was amended so as to
> drop the "affidavits are positive" requirement in favor of a "reasonable
> cause shown" requirement.   The matter is now dealt with in
> Fed.R.Crim.P. 41(e)(2)(A), where the text is stated in terms of "good
> cause," a change the Advisory Committee Note says is "intended to
> be stylistic only."

LaFave, 2 Search & Seizure § 4.7(b), n.33 (6th ed. Sept. 2020 update).

Second, the Court concludes that under either a "good cause" or "reasonable

cause" standard, the warrant for anytime execution was properly issued.   The

warrant application demonstrates that members of the drug organization being

investigated did not conduct their business only between the hours of 6:00 AM and

10:00 PM, but rather communicated with each other outside of those hours.   And,

as previously stated, the issuing judge was permitted to rely upon the affiant's

expertise and experience and credit his statement that drug traffickers frequently

operate at different hours of the day.   6041 Warrant, ¶ 27.   Gonzalez's argument

that this is just unfounded speculation is rejected for the same reasons why an

issuing court may rely on an affiant-agent's experience and expertise, as addressed

above.   Furthermore, the Court finds not persuasive the case upon which Gonzalez

relies for the proposition that something more that good or reasonable cause is

needed to be shown for a nighttime search, [Doc. 330 at 10-11 (citing *Distefano v.*

*United States*, 58 F.2d 963, 964 (5th Cir. 1932))], since *Distefano* was based on the requirements of a statute (18 U.S.C.A. § 620) that was superseded by the Federal Rules of Criminal Procedure. *See Propriety of Execution of Search Warrant at Nighttime*, 41 A.L.R.5th 171 n.67 (1996).

In any event, violations of Federal Rule of Criminal Procedure 41 "are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith." *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981); *see also United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) ("[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.") (citations omitted); *see also United States v. Williams*, 871 F.3d 1197, 1202 (11th Cir. 2017) (same); *United States v. Gerber*, 994 F.2d 1556, 1560 (11th Cir. 1993) (same). In *Marx*, the court held that failure to deliver a copy of the search warrant to the party whose premises were searched until the day after the search did not invalidate a search, in the absence of a showing of prejudice. The *Marx* court went on to explain that in order

23

to show prejudice in this context, a defendant must show that because of the violation of Rule 41, he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed. *Marx*, *id.*

Defendant bears the burden of demonstrating that he was prejudiced by the issuance of the search warrant that authorized anytime collection of geo-location data from his phone. He argues only that there was a lack of probable cause to support a conclusion that evidence of criminal activity would be found on his cell phone. [Doc. 330 at 10-12]. However, the intercepted conversations of the coconspirators dispel the argument, since these coconspirators were exchanging that cell phone number as being associated with the person who would collect proceeds from the organization's drug sales, and at least some of those conversations were occurring after 10:00 PM, and, as a result, supplying reasonable cause or good cause to support the conclusion that evidence of criminal activity would be located on the 6041 phone in the nighttime hours. *See* application for warrant for 6041 phone, ¶¶ 18, 19 (reflecting that the participants in those calls communicated with one another at 10:08 PM and 10:22 PM on March 29, 2017); *id.* ¶ 27 (affiant's statement that based on his training and experience, he knows "that drug traffickers frequently operate at different hours of the day and often transport and/or deliver drug loads during the evening and early morning hours.").

24

Finally, the Court rejects the balance of Gonzalez's post-hearing arguments. The government obtained a search warrant in order to ping his phone, and so Gonzalez's argument that he was the subject of an unconstitutional warrantless trespass contrary to *United States v. Jones*, 565 U.S. 400 (2012), [Doc. 330 at 15], is misplaced. He offers no support for his argument, [Doc. 330 at 15-16], that the warrant allowing anytime pinging for 45 days was overly broad; and in any event he has failed to satisfy his burden to show that the warrant was defective or executed improperly. *United States v. Whyte*, 928 F.3d 1317, 1333 (11th Cir. 2019) (citations omitted). Further, for the reasons addressed above, there is no requirement under the Fourth Amendment or Rule 41 that law enforcement demonstrate that the warrant could not be executed in daylight hours, and thus his argument to the contrary, [Doc. 330 at 16-17], is rejected.

Likewise, the Court finds no reason to discount the issuing judge's reliance on Dodder's training and experience. A magistrate judge may rely in determining probable cause not only the opinion of experienced agents but on reasonable inferences drawn from the facts in the affidavit about where evidence of a crime may be located. *See United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (" 'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .' ") (citation

omitted); *United States v. Wiley*, 475 F.3d 908, 916 (7th Cir. 2007) (" '. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense' ") (citation omitted).  And, here, Gonzalez does not supply any evidence that Dodder's training and experience was inadequate or insufficient to enable him to render an opinion, or why the issuing judge, whose task is simply to make a commonsense assessment of the facts in the affidavit, could not rely upon him.  *Cf. United States v. Strahan*, 674 F.2d 96, 100 (1st Cir. 1982) (noting that the fact the officer lacks expertise in a particular field does not necessarily mean probable cause is lacking, for lack of expertise does not prevent police "from sensing the obvious") (Breyer, J.).

Finally, the Court rejects Gonzalez's argument that an insufficient showing was made to conduct a "an exploratory search at night of defendant's phone." [Doc. 330 at 18-19].  *Carpenter v. United States*, 138 S. Ct. 2206 (2018), upon which he primarily relies, is inapposite since unlike *Carpenter*, law enforcement in this case obtained a valid search warrant supported by probable cause together with an adequate showing that anytime execution was reasonable or supported by good cause.

## II.   Global Positioning System ("GPS") tracking, [Doc. 121 (Ping Warrant for (706) 386-5635)]

Gonzalez separately contends that a subsequently-issued ping warrant for (706) 386-5635 (No. 1:17-MC-663-AJB) (hereinafter "the 5635 phone") was improperly issued because the subject phone was not within the Northern District of Georgia at the time the warrant was issued on July 1, 2017 at 5:33 PM. [Doc. 121 at 35-36].   In support, he claims that discovery shows that a pole camera demonstrates him leaving his Georgia residence at 11:54 AM on July 1, 2017, but the phone was pinged in Meridian, Mississippi at 7:53 PM, followed by pings in Tyler, Texas, and Los Angeles, California.   Based on this data, he argues that the warrant authorizing the pinging of the phone could not have been issued while the phone was in the Northern District of Georgia.   [Doc. 121 at 35-36].   He argues, therefore, that the warrant was invalid because the Court did not have jurisdiction to issue it and violated Federal Rule of Criminal Procedure 41.   [*Id.* at 36-37].

The Court rejects this argument.   Rule 41(b) of the Federal Rules of Criminal Procedure sets out the venue requirements for issuance of search warrants, authorizing a magistrate judge to issue a warrant for a person or property located within the district of that judge's authority (Rule 41(b)(1)) or for a person or property outside the district if the person or property was located within the district

27

at the time of the issuance of the warrant (Rule 41(b)(2)).  However, while the warrant for the 5635 phone was issued as a Rule 41 warrant supported by probable cause, 18 U.S.C. § 2703(a), (b), and (c) authorize the issuance of a nationwide warrant by a "court of competent jurisdiction," *see* 18 U.S.C. § 2711(3)(A)(i). Since the drug-trafficking/money-laundering crimes under investigation occurred at least in part in the Northern District of Georgia, the warrant to ping the 5635 phone was properly issued.

For all of these reasons, the undersigned **RECOMMENDS** that Gonzalez's motion  to suppress the evidence obtained via GPS tracking, [Doc. 121], be **DENIED**.

## III.   Title III and Roving Wiretaps, [Doc. 135]

Gonzalez challenges the Title III wiretaps that were issued after the ping warrants.  After discussing the legal framework, the Court addresses his points seriatim.

### A.   Title III framework

Title III of The Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, sets forth numerous requirements the Government must meet before electronic surveillance (wiretaps) may be authorized: 18 U.S.C. § 2518(1), the findings the district court must make, 18 U.S.C. § 2518(3), and

28

requirements for the district court's authorization order.  18 U.S.C. § 2518(4). Title III contains its own exclusionary rule under which persons aggrieved have standing to challenge the surveillance.  18 U.S.C. § 2518(10).

An application for an order authorizing or approving the interception of wire or oral communications must contain the authorization of the Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General, authorizing the application.  18 U.S.C. § 2516(1); *United States v. Giordano*, 416 U.S. 505, 520 (1974); *United States v. Small*, 423 F.3d 1164, 1178 n.7 (10th Cir. 2005); *see also United States v. Holden*, 603 Fed. Appx. 744, 748 (11th Cir. Feb. 11, 2015).

An "application must include a full and complete statement of the facts and circumstances . . . including (i) details as to the particular offense that has been, is being, or is about to be committed."  18 U.S.C. § 2518(1)(b)(i).  Thus, an application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant.  *United States v. Goldstein*, 989 F.3d 1178, 1192 (11th Cir. 2021); *Nixon*, 918 F.2d at 900.  As previously discussed, the issuing

29

judge is to make a "practical, common-sense decision" about whether the "totality of the circumstances" indicate that there is probable cause that the sought-for evidence will be obtained. *Gates*, 462 U.S. at 238. A reviewing court must "simply to ensure that the [judge] had a 'substantial basis for. . . conclud[ing]' that probable cause existed." *Id.* at 238-39 (citation omitted). The practical nature of the issuing judges' decision justifies "great deference" upon review and calls for upholding those findings even in marginal or doubtful cases. *Nixon*, *id.*; *Lockett*, 674 F.2d at 845. Like other types of warrants, probable cause must exist at the time surveillance is authorized. *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985).

Courts considering wiretap applications are allowed to rely upon the reasonable interpretations given by experienced law enforcement affiant-agents as to the code, slang or obtuse language used by those persons engaged in allegedly conspiratorial communications. *See United States v. Garcia*, 447 F.3d 1327, 1334-35 (11th Cir. 2006) ("we have recognized the 'well-established' 'rule' that 'an experienced narcotics agent' may testify as an expert to help a jury understand 'the significance of certain conduct or methods of operation unique to the drug distribution business.' ") (citation omitted); *United States v. Cano*, 289 F.3d 1354 (11th Cir. 2002) (allowing agent at trial to interpret hieroglyphics in drug ledgers);

30

*United States v. Novaton*, 271 F.3d 968, 1009 (11th Cir. 2001) (allowing police officer to testify at trial as to meaning of code words during intercepted conversations); *Jiminez*, 921 F.2d at 1567-68 (same). If a jury can properly consider this evidence, a district judge certainly may take it into consideration in determining whether a substantial basis exists to authorize communication intercepts. *United States v. Brown*, 872 F.2d 385, 392 (11th Cir. 1982) (law enforcement officers may testify as to the meaning of slang or code words); *United States v. Flores*, No. 105CR558WSDJFK, 2007 WL 2904109, at *39 (N.D. Ga. Sept. 27, 2007) (explaining that the issuing judge "may consider an agent's training and experience to offer opinions as to the methods utilized by [suspects] and, based on the same, consider an agent's interpretation of code words and language in determining whether probable cause exists to authorize a [wiretap order]").

An application for interception also must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. 18 U.S.C. § 2518(1)(c); *Van Horn*, 789 F.2d at 1496. That is, the application must include a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or too dangerous. *United States v. Carranza*,

31

921 F.2d 1557, 1564-65 (11th Cir. 1991).  "Full and complete" means a description with specificity as to why in this particular investigation ordinary means of investigation would fail or are too dangerous.  *United States v. Weber*, 808 F.2d 1422 (11th Cir. 1987).  The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed.  *United States v. Giordano*, 416 U.S. 505, 515 (1974); *United States v. Kahn*, 415 U.S. 143, 153, n.12  (1974). The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves.  *Van Horn*, *id.*;  *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984); *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978); *see also United States v. Allen*, 416 Fed. Appx. 21,  26 (11th Cir. Jan. 31, 2011) ("The statute authorizing wiretaps is not intended 'to be routinely employed as the initial step in a criminal investigation,' [*Giordano*, 416 U.S. [at] 515 [ ], but rather, it is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed. *Id.*  This does not, however, mean that the statute requires 'a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest

themselves.'  [ ] *Van Horn*, 789 F.2d [ ] 1496 [ ].").  The existence of danger is one of the justifications for electronic surveillance.  18 U.S.C. § 2518(1)(c); *Van Horn*, 789 F.2d at 1497.

The application for electronic surveillance must include a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such application.  18 U.S.C. § 2518(1)(e).  However, an inadvertent failure to disclose a prior application, or were the affiant was unaware of such a prior application, will not void the surveillance.  *Van Horn*, 789 F.2d at 1499-1500.

Finally, electronic surveillance must be conducted in such a way so as to minimize the interception of communications not otherwise subject to interception. 18 U.S.C. § 2518(5).  In considering challenges to the government's minimization, the court must make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time.  *Scott v. United States*, 436 U.S. 128 (1978).  The wiretap statute does not prohibit the interception of all nonrelevant conversations, but rather instructs law enforcement to conduct

33

the surveillance in such a manner as to minimize the interception of such conversations. *Scott*, 436 U.S. at 136. The standard is one of reasonableness. *United States v. Moody*, 977 F.2d 1425, 1433 (11th Cir. 1992). Conversations lasting less than two minutes are considered too brief "to identify the caller and characterize the conversation as merely social or possibly tainted." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1215 (11th Cir. 2010) (quoting *United States v. Bynum*, 485 F.2d 490, 500 (2d Cir. 1973)).

If a district judge decides to authorize a wire intercept, that decision can be overturned, and the evidence obtained pursuant to such order suppressed, only upon a finding that the district judge abused his or her discretion in authorizing the wiretap. *See United States v. Sweeting*, 933 F.2d 962, 964 (11th Cir. 1991); *Nixon*, 918 F.2d at 900; *United States v. Comito*, 918 F.2d 95, 98 (9th Cir. 1990).

Section 2518(8)(a) requires that "[t]he contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device" and that recording "shall be done in such way as will protect the recording from editing or other alterations." The section further provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions."

34

*Id.*; *see also United States v. Ojeda-Rios*, 495 U.S. 257, 263 (1990). In *United States v. Matthews*, 431 F.3d 1296, 1307 (11th Cir. 2005), the Eleventh Circuit joined three other circuits in concluding that "recordings are sealed '[i]mmediately upon the expiration of the period of the order' if they are sealed within one or two days of the expiration." *Id.* (citing *United States v. McGuire*, 307 F.3d 1192, 1204 (9th Cir. 2002); *United States v. Wilkinson*, 53 F.3d 757, 759 (6th Cir. 1995); *United States v. Wong*, 40 F.3d 1347, 1375 (2d Cir. 1994)). And "[c]ase law clearly holds that the tapes do not have to be sealed until the end of the extension orders, i.e., at the termination of the entire surveillance." *See United States v. Harvey*, 560 F. Supp. 1040, 1057 (S.D. Fla. 1982), *aff'd,*789 F.2d 1492 (11th Cir. 1986).

Section 2518(8)(a) has an exclusionary remedy for noncompliance with the sealing requirement, providing that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom under subsection (3) of section 2517

Moreover the good faith exception to the exclusionary rule applies to considerations of wiretap warrants. *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988).

### C.     Discussion

### 1.     Request for a hearing

Gonzalez first requests a hearing at which the Government had to show the number and identification of intercepted conversations which contained "coded" language and law enforcement's efforts or techniques to decode such conversations either during or after a conversation; how soon after the termination of any conversation the minimization occurred, including conversations in a foreign language; and who accomplished the minimization and their expertise in foreign or coded languages.  [Doc. 122 at 7].

"[W]here a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion."   *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)).   "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . .   A court need not act upon general or conclusory assertions. . . ."   *Id.* at 1284 (quoting *United States v. Richardson*, 764 F.2d 1514, 1527 (11th  Cir. 1985) (internal citations omitted)); *see also United*

*States v. Giacalone*, 853 F.2d 470, 482 (6th Cir. 1988) (holding that movant seeking to suppress fruits of a wiretap investigation bears burden to show violation, and must "make a 'sufficiently definite, specific, detailed and nonconjectural' showing of a material issue of fact so as to justify an evidentiary hearing on the minimization issue) (quoting *United States v. Ledesma*, 499 F.2d 36, 39 (9th Cir. 1974)).  Since Gonzalez has not made such a showing, the request for an evidentiary hearing is **DENIED**.

### 2.      Fruits of unlawful ping warrants

Gonzalez next argues that the intercept warrants were the fruits of unlawful ping warrants, but for the reasons stated in Parts I and II of this Report and Recommendation, the Court rejects that argument.

### 3.      Lack of Probable Cause

Gonzalez next argues that the intercept warrants were not supported by probable cause. [8]   The Court disagrees.   The supporting affidavit established probable cause.  On May 31, 2017, Dodder submitted an affidavit in support of an

---

[8]      The record shows that Gonzalez was not intercepted over TT#13 because he stopped using that phone before the intercept was in place.  Agents later learned he began using TT#15 and then 470-449-5260 ("the 5260 phone").  Gonzalez makes no independent specific arguments that the subsequent intercepts lacked probable cause, relying only on the alleged insufficiency of the original ping warrants and the first Title III order.  [*See generally* Docs. 122, 149].

application for interception of wire and electronic communications from a telephone identified as TT#13 (hereinafter "the 5670 phone" or "TT#13"), alleged to be used by Gonzalez.  Wire-17MJ0438-000034.  Gonzalez was identified as a target subject of the intercept.  *Id.* at 40.

In his affidavit, Dodder noted that the investigation to date had involved monitoring electronic communications over 12 devices and the seizure of $1,055,000 in currency, 71 kilograms of cocaine, 20 pounds of methamphetamine, 14 kilograms of heroin, 750 grams of fentanyl, and 7,181 pounds of marijuana. *Id.* at 47.  In intercepting communications over TT#7, agents learned that Piter had collected $278,000 in drug proceeds; another coconspirator, using TT#8, coordinated the distribution and inspection of an unknown quantity of drugs; interception of TT##8 & 10 disclosed that Rolex ordered ten units of drugs from Emparador and arranged for the transshipment of the drugs into the United States; and Siempre had provided Gonzalez's phone number to Chatagool for money-courier services.  He also stated that Gonzalez was believed to be in the Northern District of Georgia based on the geo-location data received from TT#13.  *Id.* at 47.

Dodder recounted that Siempre was intercepted identifying two telephone numbers previously used by Gonzalez so that others such as Rolex and Chatagool could transfer drug-related proceeds to Gonzalez but that the investigation had not

38

yet revealed the organization's stash houses or how Gonzalez transported drug proceeds to Mexico. *Id.* at 53. Agents also believed that intercepting Gonzalez would permit them to learn Siempre's identity and his involvement in the conspiracy, determine Rolex's and Chatagool's identities and those of their co-workers, and discover any new telephones used by Gonzalez. *Id.* at 53-54. Dodder also observed that agents had not intercepted Siempre using BlackBerry PIN-to-PIN conversations to communicate with Gonzalez, although they had intercepted Siempre giving out Gonzalez's phone number, and therefore sought an intercept of Gonzalez's phone in order to eavesdrop on conversations between Siempre and Gonzalez. *Id.* at 54.

Dodder related that they intercepted communications that identified the user of the 6041 phone as a money courier in Atlanta who worked for Siempre, and that they identified Gonzalez as the user of the 6041 phone as a result of surveillance and pinging that phone. *Id.* at 56. Pen register and geo-location data led agents to believe that Gonzalez stopped using the 6041 phone in April 2017, and common-call analysis, geo-location data, and intercepted communications over one of Siempre's phones demonstrated that Gonzalez was using another phone (the 8839 phone) and then the 5670 phone/TT#13 to collect drug or drug-related proceeds. *Id.*

Dodder's affidavit then set out that on March 19, 2017, Siempre told Rolex in an intercepted conversation that he would send him another number because the guy "changed it," and then gave him the number to the 6041 phone with the authenticating password ("Primo").  *Id.* at 56-57.  On March 29, 2017, during an intercepted communication, Chatagool gave Siempre the number for another Atlanta-based member of the conspiracy ("Primito"), and two minutes later, Siempre and Gonzalez engaged in a series of text messages, as well as others later in the day.  *Id.* at 57-58.  Later that same date, Siempre provided Gonzalez's 6041 phone number to Chatagool, and on that same date, Gonzalez and Primito exchanged a number of calls of short duration and text messages.  *Id.* at 58-59.  Based on a subsequent intercepted BlackBerry PIN-to-PIN conversation between Siempre and Chatagool, agents believed that Chatagool's courier, Primito, delivered $44,000 to Gonzalez.  *Id.* at 59.  In fact, Primito told law enforcement during a knock-and-talk at his Georgia residence on April 11, 2017 that he would accept drug proceeds from others and store them at his residence until picked up by couriers.  In fact, on that date, law enforcement seized $55,000 in drug proceeds and 60 pounds of marijuana from Primito's residence.  Further, geo-location data of Primito's phone confirmed that he was at or near his residence when communicating with Gonzalez and Gonzalez's phone was in the vicinity of

40

Primito's residence during the suspected proceeds exchange between them. *Id.* at 59-60, 85.

Dodder also recounted that on March 30, 2017, Rolex asked Siempre for the phone number "[s]o they can give you some money please," and in response, Siempre gave him the 6041 phone number. *Id.* at 60-61. On April 13, 2017, during an intercepted conversation, Siempre sent Rolex the 6041 phone number in order that Rolex could "give you the other money. . . ." *Id.* at 61. Then, later that date at 10:39 PM, Gonzalez received a phone call from a number associated with a person who law enforcement believed was another courier, and on April 14, 2017, Rolex advised Siempre that "[t]hey give him 15," which Dodder believed meant that $15,000 in drug proceeds were delivered to Gonzalez. *Id.* at 62.

On or about April 25, 2017, Gonzalez stopped using the 6041 phone and began using the 8839 phone, based on intercepted conversations between Siempre and Rolex on May 11, 2017, where Rolex asked Siempre to send him a cell phone number "so he can pay us" and Siempre responded with the 8839 number and the password "Primo." *Id.* at 62. Gonzalez stopped using the 8839 phone and began using TT#13 as demonstrated by Siempre giving the TT#13 number and the password to Rolex on May 23, 2017 following Rolex's request to "[s]end me the

41

cell to give you the money.  I'm coming from seeing this friend.  I already pressured him to pay me."  *Id.* at 63.

Toll analysis corroborated that Gonzalez was now using TT#13.  The first outgoing call from that phone number was to a phone believed to be used by Siempre; between April 28 and May 15, 2017, there were 70 contacts between the 8839 and Siempre's phone; the 6041 phone, the 8839 phone, and TT#13 were in contact with the same phone numbers and the same number of consistent contacts; and all three phone numbers believed to be used by Gonzalez were in contact with Mexican phones believed to be used by Siempre.  *Id.* at 63-65.  Furthermore, surveillance based on pole cameras, geo-location data, and physical surveillance allowed agents to recognize Gonzalez in the vicinity of all three phones, including at a residence in Gainesville, Georgia, associated with him.  *Id.* at 66-70.

Dodder then related the contacts between TT#13 and Siempre's Mexican phone number.[9]  Between May 14 and 24, 2017, these devices were in contact over wire communications nine times and via electronic communications 38 times.  *Id.* at 70.  He also highlighted a number of BlackBerry PIN-to-PIN conversations

_____

[9]      Dodder's affidavit also explained how he came to associate various phone numbers with Siempre, and also explained why law enforcement had not sought approval to intercept Siempre's Mexican-based phones.  WIRE-17MJ0438-000071 & n.6.

between Siempre and others where Siempre coordinated and received updates on the collection of drug proceeds, including one on May 11, 2017 where Siempre provided the number of the 8839 phone to Rolex in response for Rolex's request for a money courier, and then 18 minutes later, Siempre contacted TT#13.  *Id.* at 72-75.

These facts establish that Dodder's affidavit was supported by probable cause.  It showed that the drug organization being investigated had trafficked in large quantities of controlled substances and as a result needed a system to transmit proceeds of those transactions among the coconspirators and to Mexico.   First, the affidavit demonstrated an ongoing and continuing pattern of criminal activity. *United States v. Hyde*, 574 F.2d 856, 865 (5th Cir. 1978) (staleness issue must be examined more liberally when a continuing pattern of criminal activity is alleged; such a "result is even more defensible in wiretap cases than in ordinary search warrant cases").  Siempre gave out Gonzalez's phone number when coconspirators asked for it in order to arrange for payment of drug proceeds, and, contrary to Gonzalez's argument, [Doc. 122 at 13], confirmations that the funds were received were reported.  WIRE-17MJ0438-000062.  Second, it established that Gonzalez used TT#13, and also demonstrated that over a very short period of time, Gonzalez had changed phone numbers on at least three occasions, which is consistent with

43

Dodder's stated experience that those involved in the drug trade frequently change phones to avoid law enforcement detection.  WIRE-17MJ0438-000033.  Probable cause also was established by the connection geo-location data showed between Primito and Gonzalez, and Primito's confirmation that he would store drug proceeds at his residence until a courier came to retrieve them.

As a result, the District Judge was authorized to conclude that probable cause existed to support issuance of the Title III intercept order as to TT#13.

Probable cause also existed to support the subsequent intercept orders.  The first one, to intercept TT#15 (903-245-8658) was issued on June 9, 2017.  WIRE-17MJ0474-000146.  Agents didn't know that Gonzalez was using that phone.  *Id.* at 38.  But the supporting affidavit explained that Maribel was believed to be involved in laundering drug proceeds for Siempre, *id.* at 54, and that Siempre was intercepted over TT#11 coordinating the transfer of drug proceeds from the user of TT#15 to Maribel.  *Id.* at 59; *see also id.* at 79-83 (describing Siempre giving the TT#15 phone number for a money courier to Nueve, another coconspirator, on June 2, 2017; on June 2 and 3, 2017, toll data showed TT#15 having wire communications 14 times and electronic communications 11 times with 713-269-7948 ("the 7948 phone"), which Dodder believed showed the users of these two phones arranging to exchange drug proceeds, particularly since these two phones

44

had no contact before or since, indicative of changing phones; an intercepted phone conversation between Siempre and Nueve led agents to believe that Nueve told Siempre that the user of TT#15 agreed to provide the courier with $100,000, that $10,000 could be kept by Nueve and $86,000 delivered to Maribel; and confirmation that the money was delivered). Toll analysis showed that TT#15 was in contact with Siempre's Mexican-based phone a total of 51 times between May 31 and June 5, 2017.

Probable cause also supported the issuance of the June 28, 2017 order allowing the roving interception of (470) 449-5260 ("the 5260 phone") used by Gonzalez.  WIRE-17MJ0529-000164.  The affidavit in support showed that on following the issuance of the intercept order as to TT#15, on June 13, 2017, Siempre asked Gonzalez to transfer drug proceeds to a money courier, and Gonzalez did so with an unknown courier and Oscar Garcia-Sanchez.  *Id.* at 58. Garcia subsequently was pulled over and $250,000 was seized and a state search warrant at his residence resulted in the seizure of 24 kilograms of cocaine, $542,000 in currency, and money ledgers.  Siempre was intercepted telling Gonzalez, using TT#15, about the seizures and directed him to get a new phone.  The following day, Gonzalez began using the 5260 phone.  *Id.*; *see also id.* at 92-94.  The affidavit also

shows that Gonzalez arranged for other money deliveries on June 10, 2017.  *Id.* at 84-87.

Finally, probable cause was established for issuance of the continued roving order on July 26, 2017, for (714)-357-2847 ("the 2847 phone").  WIRE-17MJ0626-000159.  The affidavit shows that through roving interception and geo-location of the 5635 phone, agents were able to continue to learn about Gonzalez's activities.  They recognized Gonzalez's voice on the 5635 phone [10] from intercepting conversations over TT#15.  *Id.* at 70.  He was intercepted coordinating with Siempre to identify a drug courier in Atlanta who could distribute 30 units of what agents believed was heroin.  *Id.* at 70-74.  He also coordinated money deliveries, including one that resulted in the seizure of the $200,000 discussed during a series of conversations. Id. at 77-78.  After that seizure, Gonzalez stopped using the 5635 phone and began using the  2847 phone.  *Id.* at 78.  Agents were able to determine it was his phone due to recognizing his voice, common contacts, and similar results from geo-location data that they had received on Gonzalez's previous phones.  *Id.* 78-80.  The affidavit also showed that Gonzalez continued to coordinate the

---

[10]     The Court does not read Gonzalez's motion to make an independent probable cause challenge to the roving wiretap authorization for the 5635 phone, but the facts stated in the text demonstrate that probable cause existed to issue that intercept authorization.

46

collection and distribution of drugs and drug proceeds on behalf of Siempre. *Id.* at 80-85.

### 4.      Necessity

Gonzalez claims that the Title III intercept orders were invalid because the Government did not show the need for wiretap authorizations, given that they obtained numerous GPS tracking warrants, installed a pole camera outside of his residence, conducted physical surveillance including photographing him and his vehicles, obtained his driver's license, physically followed him, and had obtained wiretaps for other individuals, making the wiretaps of his phone duplicative and unnecessary.  [Doc. 12 at 14].

As noted, a wiretap application must satisfy the necessity requirement by including a "full and complete statement" describing other investigative techniques that have been tried and failed or explaining why such other techniques are unlikely to succeed. *See* 18 U.S.C. § 2518(1)(c), (3)(c).  A wiretap affidavit need not "show a comprehensive exhaustion of all possible techniques" to satisfy the necessity requirement. *Van Horn*, 789 F.2d at 1496.  Instead, it simply must show why "investigative techniques that reasonably suggest themselves" have failed or would fail. *Id.*  Furthermore, the ' "partial success of alternative investigative measures' " does not foreclose the use of a wiretap. *Goldstein*, 989 F.3d at 1195 (quoting

47

*United States v. Perez*, 661 F.3d 568, 581-82 (11th Cir. 2001); *see also United States v. Hawkins*, 934 F.3d 1251, 1258 (11th Cir. 2019) (quoting *Perez*, 661 F.3d at 581) (stating that § 2518 "does not 'foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted.' "); *United States v. Vinales*, 658 Fed. Appx. 511, 520 (11th Cir. Sept. 22, 2016) (citing *United States v. Cifarelli*, 589 F.2d 180, 183 (5th Cir. 1979) ("The statute does not require that wiretaps be used as a last resort.")).  The burden for establishing necessity is "not great," and the "affidavit need not . . . show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." *Van Horn*, 789 F.2d at 1495-96.  A wiretap is deemed necessary even where traditional investigative techniques have uncovered evidence sufficient to incriminate the defendant but insufficient to disclose "the full extent of [the defendant's] criminal activities and his coconspirators." *Perez*, 661 F.3d at 582.  The Government's showing must be read in a "practical and commonsense fashion," and a "district court is clothed with 'broad discretion' in its consideration of the application." *Alonso*, 740 F.2d at 868 (quoting *United States v. Brick*, 502 F.2d 219, 224 n.14 (8th Cir. 1974)).  In addition, even when the Government has sufficient evidence to prosecute an individual defendant based

upon evidence gathered prior to a wiretap, "it 'is unrealistic to require the termination of an investigation before the entire scope of the [conspiracy] is uncovered and the identity of its participants learned.' " *Perez*, 661 F.3d at 582 (citation omitted); see also *Goldstein*, 989 F.3d at 1196.

Dodder's affidavit for TT#13 demonstrates an ample showing of necessity and the failure of other investigative techniques.   WIRE-17MJ0438-000075-000108.   The other methods of investigation failed to identify all of the target subjects or the methods used to distribute drugs and collect drug proceeds. Although Siempre's phones were intercepted, Siempre only provided Gonzalez's phone number to coconspirators, and thus did not disclose where he stored drugs or interdict drug proceeds, or determine how Gonzalez transports the proceeds to Mexico, particularly since the location of Gonzalez's residence and the irregular intervals in which his number was provided rendered surveillance on him difficult. *Id.* at 78.

Further, although law enforcement used confidential sources of information to learn about related organizations, they had been unable to use confidential sources as to the target subjects, a number of whom were located in Mexico. *Id.* at 78-84.   No cooperating defendants or individuals had been arrested, and those that

had been arrested were not cooperating against Gonzalez. *Id.* at 84-86. Primito failed to provide information about Gonzalez even though agents knew that the two of them spoke and exchanged drug proceeds on March 29, 2017. *Id.* at 86. A number of other arrestees did not cooperate, and the agents did not believe that further attempts to get Primito to cooperate would either bear fruit, or more importantly, could actually jeopardize the investigation. *Id.* at 86-89.

The investigation prior to the first wiretap order resulted in discovering Gonzalez's residence and the two vehicles he drove. *Id.* at 90. The residence is in a rural area and the pole camera law enforcement installed offered views of the driveway but not of the residence. In addition, because of the location, physical surveillance of the residence is of limited value. *Id.* The affidavit noted that on April 8, 2017, only through the pinging of the 6041 phone did they discover that he already had left the residence. *Id.* Furthermore, the pinging of the 8839 phone was less exact than that of the 6041 phone due to the service provider's (T-Mobile versus AT&T) capabilities, and as a result, agents had less precise and less timely information as to Gonzalez's movements and whereabouts, nor of the activities of the coconspirators. *Id.* at 90-95.

The affidavit also related that search warrants and consent searches were not conducted since law enforcement had not identified all locations used by the

50

conspirators, and none of the locations that were searched demonstrated a connection to Siempre or Piter. *Id.* at 99. Furthermore, search warrant executions ran the risk of alerting the target subjects, as occurred following a warrant in a related investigation. *Id.* at 100. It also detailed why consensually-monitored conversations were not a viable investigative tool because they had no cooperators. *Id.* at 101. As to pen registers and toll records, the affidavit laid out why, although helpful, they only showed the contacts between coconspirators but did not provide sufficient information as to distribution of drugs or the collection of drug proceeds, and in any event, are generally unavailable for foreign-based phones. *Id.* at 102-03. The affidavit also related that no trash cans were ever seen in front of Gonzalez's residence to allow agents to perform trash pulls, and the one trash pull performed during the investigation as a coconspirator's residence did not result in identifying any other coconspirators. *Id.* at 103-04. It also detailed the shortcomings of using grand jury subpoenas, *id.* at 104-07, and financial investigations. *Id.* at 107-08.

This detail of alternative investigative techniques satisfied the Government's burden. Gonzalez has not demonstrated, much less alleged, how these steps were adequate to enable the Government to satisfy all of the objectives of the

investigation or that the affidavit misstated the actual or potential lack of success in undertaking these alternative investigatory methods.

### 5. Identifying persons whose communications may be intercepted

Title 18 U.S.C. § 2518(4) requires an interception order to identify any known persons whose communications are to be intercepted. Every intercept order complied with this requirement and Gonzalez fails to demonstrate, much less allege, how this provision was violated.

In this section of his motion and in the section about description of the communications to be intercepted, Gonzalez also faults the interception orders for permitting the interception and recording of background conversations intercepted in the vicinity of the target telephone while the telephone is "off the hook" or otherwise. [Doc. 122 at 16]. In support, he relies primarily on *United States v. Oliva*, 705 F.3d 390, 399-400 (9th Cir. 2012). [*See* Doc. 122 at 18-19]. For the same reason the Ninth Circuit rejected the appellant's argument in that case, the Court rejects Gonzalez's argument. Gonzalez has not shown that any evidence he seeks to suppress resulted from background conversations or when the device intercepted supposedly was "off the hook" (recognizing that such terminology does not in reality apply to a cell phone). *See Oliva*, 705 F.3d at 400. He is not entitled to an evidentiary hearing to determine if the Government relied on the "background

conversations" language in the interception orders because he has not alleged facts which if true would entitle him to relief. *Cooper*, 203 F.3d at 1285.

### 6.    Minimization

Gonzalez next contends that the Government improperly failed to minimize the conversations in violation of 18 U.S.C. § 2518(5).  [Doc. 122 at 17].  Courts must make an objective assessment of the monitoring agents' actions in light of the facts and circumstances confronting them at the time. *Scott*, 430 US at 136. A movant seeking to suppress fruits of a wiretap investigation bears the burden to show a violation, and must "make a 'sufficiently definite, specific, detailed and nonconjectural' showing of a material issue of fact so as to justify an evidentiary hearing on the minimization issue." *Giacalone*, 853 F.2d at 482 (citing *Ledesma*, 499 F.2d at 39)).

It also bears noting that "[t]otal suppression 'is not appropriate unless the moving party shows that there was a taint upon the investigation as a whole sufficient to warrant sweeping relief' . . . and is reserved for the 'particularly horrendous case' . . . 'where the government has made effectively no effort towards minimization whatsoever.' " *United States v. Suggs*, 531 F. Supp. 2d 13, 24 (D.D.C. 2008) (citations omitted); *United States v. Batiste*, No. 06-20373-CR, 2007 WL 2412837, at *16 (S.D. Fla. Aug. 21, 2007) (errors in minimizing

53

particular calls do not automatically warrant suppression of all intercepts "unless a defendant demonstrates that the entire surveillance was tainted").

Gonzalez did not demonstrate, much less allege, in which instances any supposed minimization violation occurred.  As a result, he is not entitled to a hearing on this claim, which is insufficient as a matter of law.  *United States v. Damiani*, Criminal Action File No. 1:10-CR-519-AT/AJB, 2011 WL 7574628, at *6 (N.D. Ga. Sept.23, 2011), *adopted by* 2012 WL 983726, at *1 (N.D. Ga. Mar. 20, 2012).

### 7.    Sealing

Gonzalez contends that the recordings were untimely sealed. [Doc. 122 at 19-20].  Title 18 U.S.C. § 2518(8) requires sealing immediately upon the expiration of the period of the order or extensions thereof.  The 5635 phone was intercepted pursuant to a roving wiretap order entered June 28, 2017.  WIRE-17MJ0529-000164.  The order expired July 28, 2017. *Id.* at 181.  As alleged in his motion, the last call was intercepted on July 10, 2017.  [Doc. 122 at 19].  The recordings were sealed on July 14, 2017, before the order expired.  WIRE-17MJ0529-000203.  Thus, the recordings were timely sealed because they were sealed before the order expired.

As for the 2847 phone, that phone's interception was authorized by the roving wiretap order entered June 28, 2017.  WIRE-17MJ0529-000164.  It was extended on July 26, 2017.  Wire-17MJ0626-000159.  The order expired on August 24, 2017, *id.* at 176.  The recordings were sealed on August 10, 2017, before the order expired.  *Id.* at 188.  As a result, the Government satisfied its sealing requirement under § 2518(8) because it caused the recordings to be sealed before the order authorizing the interceptions or extension thereof expired.  *Cf. United States v. Calabrese*, 492 F. Supp. 2d 906, 910 (N.D. Ill. 2007) (holding that when extensions are present, the requirement to seal does not arise until the expiration of the final extension).

### 8.    Jurisdiction

Gonzalez contends that the court did not have jurisdiction to issue interception orders for TT##1 and 6 because the phones were based in Mexico. [Doc. 122 at 20-21].  However, as pointed out by the Government, he has not shown that he was an aggrieved person as to those intercepts, and thus has no standing to challenge the interceptions.  The challenging party must be an "aggrieved person" within the meaning of 18 U.S.C. § 2518(10)(a).  An "aggrieved person" is defined by statute as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C.

§ 2510(11). A defendant bears the burden of showing he has standing to challenge the intercepted information. *Flores*, 2007 WL 2904109 at *2. Gonzalez has not shown that his communications were intercepted via these authorizations, and the facts recounted above demonstrate that he was not.

In any event, the Court agrees with the Government that jurisdiction existed to intercept communications over the Mexican-based phones because the "listening post" was present in this District. As the Court of Appeals for the District of Columbia Circuit held in rejecting an identical argument:

> Without addressing Cano-Flores's arguments about the ultimate reach of Title III, the district court found the interceptions lawful: they had taken place not in Mexico, but "in the DEA wire room located in Houston, Texas (a location within the Southern District of Texas) after they had been accessed by cellular towers located in the United States." Although the statute does not supply an explicit rule for determining where interception occurs, courts have integrated the language allowing "interception . . . within the territorial jurisdiction of the court in which the judge is sitting" with the language that defines "intercept" as the "aural or other acquisition of the contents of any . . . communication." On the basis of these provisions, for example, *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992), held that besides occurring at the site of the telephone, an interception "must also be considered to occur at the place where the redirected contents are first heard." *Id.* at 136. In a separate opinion, Judge Meskill, though rejecting this reasoning, gave it its name—the "listening post" theory. *Id.* at 144. The basic reasoning has been accepted in all courts of appeals to address the issue. *See United States v. Henley*, 766 F.3d 893, 911-12 (8th Cir. 2014); *United States v. Luong*, 471 F.3d 1107, 1109-10 (9th Cir. 2006); *United States v. Jackson,* 207 F.3d 910, 914-15 (7th Cir.), *vacated on other grounds,* 531 U.S. 953 [ ] (2000); *United States v. Denman*, 100 F.3d 399, 402-

03 (5th Cir. 1996); *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994).

*United States v. Cano-Flores*, 796 F.3d 83, 86-87 (D.C. Cir. 2015). Significantly, the *Cano-Flores* court also distinguished its own prior decision*, United States v. Glover*, 736 F.3d 509 (D.C. Cir. 2013), upon which Gonzalez relies. [*See* Doc. 122 at 20]. The *Cano-Flores* court explained that the jurisdictional defect found in *Glover* dealt with the placement of a physical bug in a jurisdiction over which the issuing judge had no jurisdiction, and not with the "listening post" theory under 18 U.S.C § 2510(4) (" 'intercept' " means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.").

As a result, the Court rejects Gonzalez's jurisdictional argument as to the earlier authorizations.

### 9.  Roving wiretap for the 5260 phone

Renteria contends that the Government improperly obtained a roving wiretap for the 5260 phone on June 28, 2017 because it knew that Gonzalez was no longer using that phone as of that date, and thus it lacked probable cause for the authorization. [Doc. 122 at 21-24].

The facts giving rise to this claim are as follows:  The government obtained a ping (geo-location data) warrant for the 5260 phone on June 16, 2017.  Case

No. 1:17-MC-609 (GEO-17MC0609-000023).  According to the return submitted on that July 3, 2017, geo-location data was last received on June 27, 2017.  GEO-17MC0609-000026.  The Government obtained the original roving interception as to the 5260 phone on June 28, 2017.  WIRE-17MJ0529-000001.  Agents began monitoring the 5260 phone on June 29, 2017, but did not intercept any communications over this phone, and the affiant to the 5635 intercept authorization swore that pen register data and geo-location data from the 5260 phone shows that Gonzalez stopped using that phone on June 27, 2017.  WIRE-17MJ0626-000068.  On July 1, 2017, agents intercepted Siempre tell Rolex about the 5635 phone number.  WIRE-17MJ0626-00068-69.

Gonzalez argues that the fact that the affidavit for authority to intercept the 5635 phone states that "agents know" that he stopped using the 5260 phone on June 27, combined with the 5260 ping-warrant return reflecting the last ping was received on June 27, demonstrates that the "agents knew" he was not using the 5260 phone when they applied to intercept it on June 28.  This argument fails for several reasons.

First, Gonzalez has not demonstrated that the agents in fact knew on June 28 that the 5260 geo-location data ended on June 27, for example, by citing to a geo-

58

location report received by the agents *prior to* the submission of the Title III warrant application to the District Judge for the same phone.

Second, and more importantly, the authorization for roving wiretaps does not necessarily apply to identifiable phones.  A roving wiretap allows the government to "intercept[ ] any and all identified telephones used" by an individual, 18 U.S.C. § 2518(11)(b), and may be authorized if the affidavit includes evidence of that person "thwarting interception" by law enforcement.  *United States v. Shannon*, 766 F.3d 346, 349 n.4 (3d Cir. 2014); *see also* 18 U.S.C. § 2518(11)(b)(ii); *United States v. Hermanek*, 289 F.3d 1076, 1087 (9th Cir. 2002) (holding that a "roving wiretap" allows government agents "to intercept communications to and from any cellular phone number used by the target of an investigation).  The District Judge's order authorizing the interception included such a finding, *see* WIRE-17MJ0529-000175-76 ("The application has also demonstrated adequately within the meaning of Title 18, United States Code, Section 2518(11)(b), that GONZALEZ-RENTARIA's use of various and changing cellular telephones could have the effect of thwarting interception from a specific cellular telephone facility."); and the showing made in the application that Gonzalez repeatedly changed phones satisfied the Government's burden to show this conduct was intended to thwart law enforcement.  As a result, the 5260

59

authorization is not invalidated even if there is some evidence (although not conclusive at the time of the application) that Gonzalez was no longer using the phone.

In conjunction with this argument, Gonzalez seeks a *Franks* hearing. A challenge to a wiretap authorization on the grounds of falsity or reckless statements in the supporting affidavit is handled the same as a similar challenge to an ordinary search warrant, pursuant to *Franks*. *United States v. Bascaro*, 742 F.2d 1335, 1344 (11th Cir. 1984). In *Franks*, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search. *Franks*, 438 U.S. at 171-72; *United States v. Aisenberg,* 358 F.3d 1327, 1333 (11th Cir. 2004). *Franks* also applies when the "misinformation" involves omissions from the affidavit " 'made intentionally or with a reckless disregard for the accuracy of the affidavit.' " *Madiwale v. Savaaiko*, 117 F.3d 1321, 1326-27 (11th Cir. 1997) (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)). However, "[o]missions that are not reckless, but are instead negligent . . . or

60

insignificant and immaterial, will not invalidate a warrant. . . . Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." *Id.* at 1327 (citations omitted).

To mandate a *Franks* evidentiary hearing,

> the defendant's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

*Franks,* 438 U.S. at 171-172; *Novaton*, 271 F.3d at 986. The Court concludes that Gonzalez's showing in insufficient. First, as noted, he has not shown that the affiant knew on June 28, 2017 that Gonzalez had stopped using the 5260 phone on June 27, 2017. The fact that the affiant realized this to be the case in the geo-

location warrant return on July 3 does not trigger a *Franks* hearing.  In fact, in applying for a geo-location warrant for the 5635 phone on July 1, 2017, the affiant averred that agents believed that Gonzalez "may have stopped using the 5260 Phone," a sworn statement far from the definitive interpretation given by Gonzalez to subsequent statements averred to by the Government in later applications.

Second, the Court concludes that the warrant would have issued even if the application would have provided that Gonzalez ceased usage of the 5260 phone on June 27, 2017.  As previously concluded, the Government made an adequate showing in the intercept application for the 5260 phone that Gonzalez's frequent changing of phone numbers was intended to thwart law enforcement's interception efforts.

As a result, Gonzalez is not entitled to a *Franks* hearing.

In conjunction with his challenge to the roving wiretaps, Gonzalez raises a number of arguments similar to those previously addressed.  For example, he challenges the District Court's jurisdiction to issue an intercept order as to the 5635 phone since it is clear that the phone was in Meridian, Mississippi when the Title III warrants issued, and as to the 2847 phone, which was in Los Angeles, California, again relying on *Glover*.  [Doc. 122 at 25-29].  The Court rejects this argument and the application of *Glover* to the facts of the case for the same reasons as previously

discussed.   As recognized in *Cano-Flores*, 796 F.3d at 86-87, because the "listening post" was located in this District, the District Court had jurisdiction to issue the warrants even though the cell phones at the time of the authorization were in Mississippi or California respectively.

He also contends that since 5260 and 5635 phones were not "the same phones," the roving wiretaps were unlawful.  [Doc. 122 at 29-30].  Again, however, the purpose of the roving wiretap authorization is to intercept any device used by the target subject based on a finding that the target changes devices to thwart law enforcement,  as  was  shown  here.    18 U.S.C. §  2518(11)(b)(ii); *Shannon*, 766 F.3d at 349 n.4; *Hermanek*, 289 F.3d at 1087.  Thus, the Court rejects this argument.

### 10.  Roving wiretap constitutionality

Gonzalez contends that the roving wiretap authority is unconstitutional because it violates the Fourth Amendment's particularity requirement.  [Doc. 122 at 30-33].  The Fourth Amendment requires that warrants "particularly describ(e) the place to be searched, and the persons or things to be seized."  U.S. Const. amend IV.  "A warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad."  *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000).   "A description is sufficiently particular

63

when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982).

In arguing for the relief requested, Gonzalez acknowledges that several courts have rejected his argument that roving wiretap authorizations offend the Fourth Amendment's particularity requirement. *United States v. Gaytan*, 74 F.3d 545, 553 (5th Cir. 1996); *United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993), *abrogated on other grounds by Groh v. Ramirez*, 540 U.S. 551 (2004); *United States v. Petti*, 973 F.2d 1441, 1445 (9th Cir. 1992) ("The conditions imposed on "roving" wiretap surveillance by 18 U.S.C. § 2518(11)(b)(ii) satisfy the purposes of the particularity requirement. The statute does not permit a 'wide-ranging exploratory search,' and there is virtually no possibility of abuse or mistake. Only telephone facilities actually used by an identified speaker may be subjected to surveillance. . . .") (footnote omitted). However, he argues, none of these cases deals with the situation that a wiretap order could issue for an unknown phone. [Doc. 122 at 32-33].

The Court first must determine if Gonzalez's challenge is "facial" or "as applied." A facial challenge seeks to invalidate a statute or regulation itself. *Jacobs v. Florida Bar*, 50 F.3d 901, 905-06 (11th Cir. 1995). While facial Fourth

64

Amendment statutory challenges are not barred, *City of Los Angeles v. Patel*, 576 U.S. 409, 45 (2015), the Supreme Court has established that a "facial challenge to a legislative [a]ct is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Courts construe a facial constitutional challenges to be an as applied challenge, if possible. *See Am. Fed'n of State, Cnty. & Mun. Employees Council 79 v. Scott*, 717 F.3d 851, 864 (11th Cir. 2013).

Defendant's facial challenge fails because in this case, the Government sought roving warrants for known phones and so even if arguably there could be situations like foreseen by Gonzalez, this is not such a case. Moreover, his "as applied" argument also fails. As the *Bianco* court recognized,

> Section 2518(11)(a) specifically addresses some of the concerns expressed by the Supreme Court that warrants be particular; it requires a full and complete statement as to why a particular description of the location to be monitored is not practical. *See* 18 U.S.C. § 2518(11)(a)(ii). With regard to this section, [C]ongress cited an effort to thwart surveillance as an example of impracticality, stating:
>
> > The judge must find that the ordinary specification rules are not practical. Situations where ordinary specification rules would not be practical would include those where a suspect moves from room to room in a hotel to avoid a bug or where a suspect sets up a meeting with another suspect on a beach or a field. In such situations, the order would indicate authority to follow the

65

> suspect and engage in the interception once the targeted conversation occurs.
>
> S.Rep. No. 541, 99th Cong., 2d Sess. 32, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3586. Among the circumstances, therefore, in which congress intended the "roving bug" to be used was a situation, such as here, where the target is attempting to thwart surveillance.

*Bianco*, 998 F.2d at 1116.  And *Petti* applied this reasoning to roving wiretaps of cell phones because only phones used by the identified speaker are subject to interception, thus ameliorating the particularity concerns of the Fourth Amendment. *Petti*, 973 F.2d at 1445.

The Court finds *Bianco* and *Petti* persuasive in the absence of any Supreme Court or Eleventh Circuit precedents to the contrary.  As a result, Gonzalez's constitutional challenge to 18 U.S.C. § 2518(11) is rejected.[11]

## IV.   Conclusion

For all of the above stated reasons, the undersigned **RECOMMENDS** that Defendant Gonzalez's motions to suppress, [Docs. 121, 122], be **DENIED**.

---

[11]   Because the Court finds that the geo-location, wiretap, and roving wiretaps were lawful, there is no need to address Gonzalez's remaining fruit-of-the-poisonous-tree and *Leon* good-faith arguments as to the wiretaps.  [Doc. 122 at 33-34].

**IT IS SO RECOMMENDED**, this the 9th day of December, 2021.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE